# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

———————————————————— )
UNITED STATES OF AMERICA,         )      NO. 05-CR-10102 JLT
                                )
               Plaintiff,      )
                                )
v.                                )
                                )
JOHN BRUENS, MARY STEWART,    )
MELISSA VAUGHN, and            )
MARC SIROCKMAN,               )
                                )
               Defendants.     )
———————————————————— )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO STRIKE THE SURPLUSAGE IN THE INDICTMENT

SIDLEY AUSTIN LLP
Thomas McC. Souther, Esq.
   (admitted *pro hac vice*)
Roger J. Hawke, Esq.
   (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Counsel for John Bruens*

MORRISON & FOERSTER LLP
Adam Hoffinger, Esq.
   (admitted *pro hac vice*)
James M. Sullivan, Esq.
   (admitted *pro hac vice*)
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20008-1888
(202) 887-1500

*Counsel for Melissa Vaughn*

GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE, P.C.
Mark A. Berman, Esq.
   (admitted *pro hac vice*)
Robert G. Marasco, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 596-4500

*Counsel for Mary Stewart*

MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY & POPEO, P.C.
Tracy A. Miner, Esq.  BBO # 547137
McKenzie E. Webster, Esq.  BBO #651204
One Financial Center
Boston, Massachusetts 02110
(617) 542-6000

*Counsel for Marc Sirockman*

Defendants John Bruens, Mary Stewart, Melissa Vaughn, and Mark Sirockman ("Defendants") respectfully move this Court for an order striking the surplusage from the Indictment returned on April 14, 2005 (the "Indictment"), pursuant to Federal Rule of Criminal Procedure 7(d) ("Rule 7(d)).[1]

## PRELIMINARY STATEMENT

The Indictment alleges against Defendants discrete and narrow criminal charges – that is, conspiring to offer and offering to certain doctors a paid trip to an April 1999 medical conference in Cannes, France (the "Cannes Conference"), in exchange for the doctors' agreement to write additional prescriptions of a particular drug. The prosecution does not dispute this: "This indictment is all about the Cannes conference." (See statement by Ms. Carmody, Transcript of Motion Hearing Before the Honorable Marianne B. Bowler, dated March 6, 2006, ("Tr.") at 8.)[2] The allegations in the Indictment, however, go far beyond the Cannes Conference. The Indictment alleges at length irrelevant details about Serostim's scientific history, indications, and medical application, as well as other AIDS drugs on the market. These allegations are wholly irrelevant to the charges against Defendants and should be stricken from the Indictment as surplusage pursuant to Rule 7(d).

## ARGUMENT

The purpose of an indictment is to inform the accused of the nature of the accusation against him, and an indictment "must be a plain, concise, and definite statement of the essential facts constituting the offense charged." Federal Rule of Criminal Procedure 7(c)

---

[1] For the Court's convenience, Defendants have attached hereto, as Exhibit A, a black-lined version of the Indictment to indicate specifically which allegations we respectfully request the Court to strike as surplusage.

[2] See also Tr. at 12 ("[T]his [case] is about the Cannes conference. That's what this conspiracy is and that's what the charges are against [Defendants].").

(emphasis added).  An allegation in a criminal indictment that is not an essential element of the offense charged is surplusage.  See Ford v. United States, 273 U.S. 593, 602 (1927).  Rule 7(d) provides that, upon a motion by the defendant, a court "may strike surplusage from the indictment or information."  This rule serves to protect a defendant "against immaterial or irrelevant allegations in an indictment . . ., which may . . . be prejudicial."  U.S. v. Fahey, 769 F.2d 829, 841-842 (1st Cir. 1985) (quoting Advisory Committee Notes to Rule 7(d)).

A court has broad discretion to strike surplusage from an indictment.  U.S. v. Bateman, 805 F. Supp. 1045, 1050 (D.N.H. 1992).  This Court has held that where portions of an indictment are inflammatory, prejudicial, and irrelevant to the crime charged, the court should strike the allegations from the indictment.  See U.S. v. Gambale, 610 F. Supp. 1515, 1542-43 (D. Mass. 1985); U.S. v. Sawyer, 878 F. Supp. 279, 294 (D. Mass. 1995), aff'd, 85 F.3d 713 (1st Cir. 1996).  "The determinative question in a motion to strike surplusage is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment."  Gambale, 610 F. Supp. at 1543 (quoting U.S. v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).  If allegations in an indictment "will not be part of the proof at trial[, they] are treated as useless averment that can be ignored or simply redacted."[3]  Bateman, 805 F. Supp. at 1050.  Accordingly, a court should strike surplus allegations from an indictment where, as here, they are irrelevant to the offenses charged.

---

[3] There can be no doubt that an indictment that has been redacted pursuant to Rule 7(d) remains valid for all purposes.  Redacting an indictment, upon a defendant's motion, does not offend the notice and review functions served by a grand jury's issuance of an indictment.  See U.S. v. Smith, 918 F.2d 1032, 1036 (2d Cir. 1990).  As long as the redacted indictment fully and clearly sets out the same offenses, and the same elements of those offenses, as the indictment returned by the grand jury, a defendant's right to a grand jury is not violated simply because portions of the indictment were removed or redacted at the defendant's request.  See U.S. v. Miller, 471 U.S. 130, 144-45 (1985); Bateman, 805 F. Supp. at 149.  As demonstrated in Exhibit A, the redactions Defendants seek do not disturb the offenses or elements alleged therein.

The government concedes that this case is limited to the narrow allegation that, in early March 1999, Defendants offered certain doctors a paid trip to the April 1999 Cannes Conference in exchange for the doctors' agreement to write additional Serostim prescriptions. Allegations regarding the nature of the drug being prescribed, the definition of wasting, and information about other drugs being used at that time to combat AIDS are of no consequence to the alleged conduct of the Defendants. The Indictment also includes unnecessary allegations about the scope of the FDA's approval of Serostim, that it was "a very expensive drug" (¶ 10), that it was not a "first line" choice of many physicians (id.), and the percentage of Serostim prescriptions paid for by Medicaid.

Defendants' concern is not only that this improper "background" material is in and of itself highly prejudicial. The concern is also that if the Government is permitted to offer proof far beyond the actual charges in the Indictment, it will seek to put in other irrelevant evidence supposedly also part of this "background." For example, the Government repeatedly has insinuated that Serostim was not an effective medication, that it was being promoted for conditions other than AIDS wasting, that improper sales techniques were being used, etc. The so-called "background" that the Government has unnecessarily included in the Indictment may open the door to an effort to color the issues by implying that there is misconduct apart from what the Defendants have been charged with. Because – as the Government repeatedly has conceded – "[t]his indictment is all about the Cannes conference" (Tr. at 8), these irrelevant background allegations do not belong the Indictment.

## **CONCLUSION**

For the foregoing reasons, the background facts alleged in the Indictment, as specifically identified in Exhibit A, should all be struck from the Indictment as surplusage pursuant to Rule 7(d).

Respectfully submitted,

JOHN BRUENS, MARY STEWART,
MELISSA VAUGHN, and MARC SIROCKMAN
by their undersigned attorneys:

  /s/ Thomas McC. Souther
Thomas McC. Souther, Esq.
    (admitted *pro hac vice*)
Roger J. Hawke, Esq.
    (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Counsel for John Bruens*

  /s/ Mark Berman
Mark A. Berman, Esq.
    (admitted *pro hac vice*)
Robert G. Marasco, Esq.
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 596-4500

*Counsel for Mary Stewart*

  /s/ Adam Hoffinger
Adam Hoffinger, Esq.
    (admitted *pro hac vice*)
James M. Sullivan, Esq.
    (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20008-1888
(202) 887-1500

*Counsel for Melissa Vaughn*

  /s/ Tracy A. Miner
Tracy A. Miner, Esq.  BBO # 547137
McKenzie E. Webster, Esq.  BBO #651204
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY & POPEO, P.C.
One Financial Center
Boston, Massachusetts 02110
(617) 542-6000

*Counsel for Marc Sirockman*

Dated:  September 19, 2006

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | Criminal Number _____ |
| | ) | |
| v. | ) | **VIOLATION:** |
| | ) | |
| **JOHN BRUENS,** | ) | 18 U.S.C. § 371 - Conspiracy to Offer |
| **MARY STEWART,** | ) | and Pay Illegal Remunerations to |
| **MELISSA VAUGHN,** and | ) | Physicians |
| **MARC SIROCKMAN,** | ) | 42 U.S.C. § 1320a-7(b)(b)(2) - Offers |
| | ) | and Payments of Remunerations to |
| Defendants. | ) | Physicians |
| | ) | 18 U.S.C. § 2 - Aiding and Abetting |
| _____ | ) | |

# I N D I C T M E N T

The Grand Jury charges:

## PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

1. Serono Inc., a/k/a Serono Laboratories, Inc. (hereinafter "Serono"), a Delaware

    Corporation, was a subsidiary of Ares-Serono, S.A., an international

    pharmaceutical and bio-technology company with corporate headquarters in

    Geneva, Switzerland.  The United States headquarters of Serono was located in

    Norwell, Massachusetts.  Serono was engaged in the business of marketing and

    selling pharmaceutical and bio-technology products.

2. From in or about 1996 and thereafter, Serono's Metabolic and Immune Therapy

    business unit (hereinafter "M&IT") was responsible for marketing and selling the

    drug Serostim, which was Serono's proprietary name of the generic drug,

"somatropin," a recombinant human growth hormone. Serono marketed and sold Serostim throughout the United States.

3.    In March of 1999, the M&IT sales force was divided into six sales Regions each led by a Regional Director: the Northeast Region (Massachusetts, Maine, Connecticut, Vermont, New Jersey, parts of Pennsylvania and New York State); the New York Region (New York City and its environs); the Southeast Region (Florida, Louisiana, Mississippi, Alabama and Texas); the Central Region (Illinois, Wisconsin, Missouri, Arkansas, Oklahoma, Kentucky, Michigan, Minnesota, North Dakota, South Dakota, Nebraska, Iowa and Indiana); the Mid-Atlantic Region (Maryland, Delaware, Georgia, North Carolina, South Carolina, Ohio, West Virginia, and part of Pennsylvania); and the Western Region (California, Oregon, Washington, Arizona, and Colorado).

## The Defendants

4.    Defendant **JOHN BRUENS** (hereinafter referred to as "**BRUENS**") held various positions in Serono. In 1999, defendant **BRUENS** was the Vice-President of Marketing for M&IT working out of Serono headquarters in Massachusetts and reported directly to X, an executive in M&IT (hereinafter "Executive X").

5.    Defendant **MARY STEWART** (hereinafter referred to as "**STEWART**") held various positions in Serono. In 1999, defendant **STEWART** was the Vice-President of Sales of M&IT working out of Serono headquarters in Massachusetts and reported directly to Executive X.

6.    Defendant **MELISSA VAUGHN** (hereinafter referred to as "**VAUGHN**") held various positions in Serono's M&IT business unit. In 1999, **VAUGHN** was the Regional Director of Sales for the Southeast Region and reported directly to

**STEWART**. As Regional Director of Sales for the Southeast Region, **VAUGHN** supervised sales representatives (known within Serono as "clinical consultants") in Florida, Louisiana, Mississippi, Alabama and Texas.

7. Defendant **MARC SIROCKMAN** (hereinafter referred to as "**SIROCKMAN**") was employed by Serono's M&IT business unit in a variety of positions. In or about January of 1999, **SIROCKMAN** became Regional Director for the Northeast Region and reported directly to defendant **STEWART**. As Regional Director of Sales for the Northeast Region, defendant **SIROCKMAN** supervised clinical consultants in Massachusetts, Maine, Connecticut, Vermont, New Jersey, parts of Pennsylvania and New York State.

### Serono and Serostim

8. At various times, defendants **BRUENS**, **STEWART**, **VAUGHN** and **SIROCKMAN**, along with others both known and unknown to the Grand Jury, including Executive X and Adam Stupak, who was the Regional Director of Sales for the New York Region, were responsible for sales and marketing of Serostim, Serono's human growth hormone drug. ~~Serostim was a recombinant human growth hormone, consisting generally of growth hormone taken from an animal and modified, using DNA technology, by the addition of the human growth hormone gene. Serono received accelerated approval from the United States Food and Drug Administration ("FDA") in 1996 for Serostim to treat AIDS wasting, also known as cachexia, a condition involving profound involuntary weight loss in AIDS patients. At the time the FDA approved Serostim, AIDS wasting was an AIDS-defining condition that constituted the leading cause of death among AIDS patients~~.

9.    Serostim was an injectable drug that was prescribed per milligram ("mg.") and was dispensed in vials. The dosing range for Serostim was from 4 to 6 mg. per patient per day based upon the patient's weight. The most common dose was 6 mg. per day. The recommended course of treatment for Serostim was for twelve weeks.

10.   Serostim was a very expensive drug. The average wholesale price ("AWP") was $42 per mg. At 6 mg. per day, a prescription for Serostim was 168 mg. per 28-day cycle, and the cost per 28-day cycle was approximately $7056. A twelve-week course of therapy cost approximately $21,168. Due to its cost, among other factors, many physicians treating AIDS patients did not use Serostim as a "first line" or primary choice of therapy.

11.   Serostim came on the market concurrently with the advent of protease inhibitor drugs. These drugs, often referred to as Highly Active Anti-Retroviral Therapy, or HAART, dramatically curtailed, in the United States, the proliferation of the AIDS virus in a given patient, particularly when these drugs were used in combination with one another (commonly referred to as "AIDS cocktails"). Given the decreased viral loads in HIV patients taking these drugs, the incidence and prevalence of the AIDS wasting syndrome began to decline markedly among AIDS patients. Consequently, the demand for Serostim began to drop significantly immediately following launch of the drug in the Fall of 1996.

**The Medicaid Program**

12.   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, established a program to enable the states to furnish medical assistance to certain categories of persons whose income and resources were insufficient to meet the costs of

4

necessary medical services.  Commonly called Medicaid, the program was administered by the states, but was funded jointly by the federal and state governments.

13.     To participate in the Medicaid program, a state was required to develop a plan that was approved by the Secretary of Health and Human Services as meeting federal requirements.  The state paid qualified providers for furnishing necessary services covered by the state plan to individuals who were eligible for medical assistance.  The federal government contributed a portion of the costs that each participating state incurred in purchasing items and services from qualified providers on behalf of eligible persons.  The state bore the remainder of the costs.  At all times relevant hereto, the States of New York, New Jersey and Florida, were among the states that had Medicaid programs receiving federal funding.

14.     State Medicaid programs, including those in New York, New Jersey and Florida were "federal health care programs" within the meaning of 18 U.S.C. § 24, in that they were public plans affecting commerce under which medical benefits, items and services were provided to individuals under the plans.

15.     The federal government contributed to the costs of prescriptions for persons who were Medicaid beneficiaries, including but not limited to persons disabled due to HIV infection and AIDS under the New York, New Jersey and Florida State Medicaid programs.

## Serostim and the Medicaid Program

16.     Medicaid paid for approximately 75% of all Serostim prescriptions nationwide.  The total claims paid by Medicaid nationwide from 1997 through 1999 were over $200 million.  From 1997 through 1999, Medicaid claims in New York were over

$53 million; in New Jersey were over $12 million; and in Florida were over $25 million.

17. As discussed in this indictment, Drs. RL, P, DC, AC, O, G and W were each Medicaid providers who provided care and treatment for Medicaid-eligible patients who were HIV positive or suffering from AIDS. Drs. RL and P were located in and treated patients in Florida; Drs. DC and AC were located in and treated patients in New Jersey; and Drs. O, G and W were located in and treated patients in New York. Each of these physicians prescribed Serostim from time to time to patients who were Medicaid program beneficiaries. The Medicaid program in the states in which these physicians provided treatment reimbursed the Serostim prescriptions for the physicians' Medicaid eligible patients.

**The Marketing and Sales of Serostim in 1999**

18. During 1999, the top managers of the M&IT business unit who were responsible for Serostim sales and marketing were Executive X and defendants **BRUENS** and **STEWART**.

19. In or about late 1998 or early 1999, Serono scheduled a National Sales Meeting to be held in Massachusetts from March 15-19, 1999, at which time representatives from various corporate business units of Serono, including Executive X, and defendants **BRUENS** and **STEWART** on behalf of the M&IT unit, would be required to present sales information concerning the products being marketed by their respective corporate business units.

20. In February of 1999, Executive X, along with defendants **BRUENS** and **STEWART**, were aware that the M&IT business unit was falling significantly short of its sales goals with respect to sales of Serostim.

21.     The 3rd International Conference on Nutrition and HIV Infection was held in Cannes, France from April 22-25, 1999 (hereinafter referred to as the "Cannes Conference").  The Cannes Conference was organized to include new data on advances in the treatment of nutritional aspects of HIV disease~~, including but not limited to the effects of protease inhibitors on body composition, metabolism and hormone systems~~.

## COUNT ONE
## (CONSPIRACY)

### The Conspiracy

22.     Commencing on or about March 1, 1999, and continuing thereafter until in or about December of 1999, the exact dates being unknown to the Grand Jury, in the District of Massachusetts and elsewhere, defendants

**JOHN BRUENS,**
**MARY STEWART,**
**MELISSA VAUGHN,** and
**MARC SIROCKMAN**

and others known and unknown to the Grand Jury, including Adam Stupak and Executive X, knowingly and willfully combined, conspired, and agreed to commit an offense against the United States, to wit, 42 U.S.C. § 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to physicians to induce them to refer individuals, including Medicaid patients, to pharmacies for the furnishing of the drug Serostim, for which payments were made in whole and in part under state Medicaid programs.

### Purpose of the Conspiracy

23.     It was the purpose of this conspiracy to target physicians who were high prescribers of Serostim or who were generally regarded as "thought leaders" and to offer certain of these physicians financial incentives in order to obtain the number of prescriptions that would advance a sales goal of increasing sales by $6,000,000, which was to be accomplished by offering an all-expenses paid trip for each physician and a guest to the Cannes Conference in return for the physicians writing additional prescriptions of Serostim.

### Means and Manner of the Conspiracy

24.     It was a part of the conspiracy that Executive X and defendants **BRUENS** and **STEWART** devised a plan called the "$6m-6 Day Plan," which had as an objective to target top prescribing Serostim physicians and top "thought leader" physicians in the AIDS/HIV medical community and then induce the targeted physicians to write more prescriptions by offering as an inducement an all-expenses paid trip to the Cannes Conference.

25.     It was a further part of the conspiracy that Executive X and defendants **BRUENS** and **STEWART** summoned the six Regional Directors of M&IT, including Adam Stupak and defendants **VAUGHN** and **SIROCKMAN**, to an emergency meeting at the Boston Harbor Hotel on March 1, 1999.  At this meeting, which included other M&IT personnel, Executive X and defendants **BRUENS** and **STEWART** told the six Regional Directors that they were falling short of their sales goals for Serostim.  Executive X and defendants **BRUENS** and **STEWART** also advised the Regional Directors that they needed to "dig their way out" of this fiscal crisis and informed the Regional Directors of the "$6m-6 Day Plan."

26.     It was a further part of the conspiracy that, to effectuate the objectives of the "$6m-6 Day Plan," various co-conspirators within the M&IT unit would offer to selected physicians an all-expenses paid trip to the Cannes Conference in return for the physicians writing additional prescriptions of Serostim for patients. Although this target number of prescriptions per physician changed over time, the "$6m-6 Day Plan," as originally explained by defendants **BRUENS** and **STEWART**, would increase total sales of Serostim by more than $6,000,000 within six (6) days.

27.     It was a further part of the conspiracy that Executive X and defendants **BRUENS** and **STEWART** required each Regional Director, including Adam Stupak and defendants **VAUGHN** and **SIROCKMAN**, to report daily to Serono headquarters in Massachusetts the number of Serostim prescriptions that they obtained during the sales push, including those prescriptions obtained from the key physicians who were targeted and offered the opportunity to attend the Cannes Conference.

28.     It was a further part of the conspiracy that defendants **BRUENS**, **STEWART**, **VAUGHN** and **SIROCKMAN** and various co-conspirators, including Adam Stupak, offered and caused to be offered to selected physicians the opportunity to attend the Cannes Conference with a guest with all expenses paid by Serono in return for the physicians writing additional prescriptions of Serostim.

29.     It was a further part of the conspiracy that, in exchange for the physicians writing additional Serostim prescriptions, various co-conspirators including Executive X and defendants **BRUENS**, **STEWART**, **VAUGHN** and **SIROCKMAN**, caused

Serono to pay for the travel expenses of the physicians and their guests who actually attended the Cannes Conference.

30.   It was a further part of the conspiracy that, in exchange for the physicians' Serostim's prescriptions, various co-conspirators, including Executive X and defendants **BRUENS**, **STEWART**, **VAUGHN** and **SIROCKMAN**, caused Serono to pay thousands of dollars for the hotel accommodations, some meals, and entertainment for the physicians and their guests while they were at the Cannes Conference.

31.   It was a further part of the conspiracy that various co-conspirators, including defendant **BRUENS**, authorized and caused a variety of personal gifts to be provided to the physicians and their guests who attended the Cannes Conference.

32.   It was a further part of the conspiracy that, after certain physicians rejected the Cannes offer, various co-conspirators advised certain of the physicians who had already been offered the all-expenses trip to the Cannes Conference that they would subsequently be asked to speak on behalf of Serono about the issues presented at the conference and about Serostim, and the physicians were paid separately for these speaking engagements.

### Overt Acts

In furtherance of this conspiracy, and to effect the objects thereof, defendants **BRUENS**, **STEWART**, **VAUGHN** and **SIROCKMAN** and other co-conspirators known and unknown to the Grand Jury, including Executive X and Adam Stupak, engaged in the following overt acts, among others, in the District of Massachusetts and elsewhere:

33. On March 1, 1999, Executive X, together with defendants **BRUENS** and **STEWART**, met with the six Regional Directors, including defendants **VAUGHN** and **SIROCKMAN**, and with Adam Stupak and other M&IT employees at the Boston Harbor Hotel and advised them of the proposed plan to offer selected physicians an all-expenses paid trip to the Cannes Conference in return for additional prescriptions of Serostim.

34. On or about March 2, 1999, defendants **VAUGHN** and **SIROCKMAN** and other co-conspirators, including Adam Stupak, telephoned and sent e-mails to their respective sales forces passing forward the directions of defendants **BRUENS** and **STEWART** and advising their respective sales forces of the "$6m-6 Day" sales plan and the plan to offer the Cannes trip to certain physicians.

35. On or about March 2 or 3, 1999, defendants **VAUGHN** and **SIROCKMAN** and other co-conspirators, including Adam Stupak, left Boston to return to their respective regions to implement the plan that was agreed upon at the Boston Harbor Hotel.

36. On or about March 12, 1999, defendants **BRUENS** and **STEWART** left a voice-mail message for the Regional Directors, including defendants **VAUGHN** and **SIROCKMAN** and Adam Stupak, requesting confirmation of the physicians that Serono would be inviting to the Cannes Conference.

### The Florida Physicians

### The Offers to Drs. RL and P

37. Between on or about March 1 and on or about March 3, 1999, various co-conspirators, including defendants **BRUENS**, **STEWART** and **VAUGHN**, caused a co-conspirator who was a Serono clinical consultant to visit Dr. RL, a

physician in Florida who treated HIV positive and AIDS patients, and to offer Dr. RL the trip to the Cannes Conference in return for writing additional prescriptions of Serostim.

38.    Between on or about March 1, 1999 and on or about March 3, 1999, various co-conspirators, including defendants **BRUENS**, **STEWART** and **VAUGHN**, caused a co-conspirator who was a Serono clinical consultant to visit the office of Dr. P, a physician in Florida who treated HIV positive and AIDS patients, and to offer Dr. P the trip to the Cannes Conference in return for writing additional prescriptions of Serostim.

39.    On or about March 3, 1999, defendant **VAUGHN**, after learning that at least one doctor had reacted negatively to the offer of the Cannes trip in return for additional Serostim prescriptions, sent a voice-mail to defendants **BRUENS**, **STEWART** and **SIROCKMAN**, and to others, including Adam Stupak, in which she stated that at least one doctor told a clinical consultant that this program was "unethical and the very thing that the FDA looks for . . ." and further advised the recipients of the voice-mail that "I just wanted to let you know that we won't be doing this program in the south."

40.    On or about March 4, 1999, as part of the reporting requirements for the "$6m - 6 Day Plan," defendant **VAUGHN** reported via e-mail to Executive X and to defendants **BRUENS** and **STEWART** and others that Dr. P had written one (1) Serostim prescription on March 3, 1999, and that Dr. P had written seven (7) Serostim prescriptions on March 4, 1999.

41.    On or about March 13, 1999, defendant **VAUGHN** advised defendant **BRUENS** that Dr. P would attend the Cannes Conference and would need business-class airline tickets.

42.    On or about April 8, 1999, defendant **BRUENS** directed an employee in Norwell, Massachusetts, to charge $7,846.64 on a corporate credit card to cover the cost of Dr. P's round trip airfare, which had been booked by Serono's travel agency.

### The New Jersey Doctors

### The Offer to Dr. DC

43.    In or about March 1999, the exact dates being unknown, various co-conspirators, including defendants **BRUENS**, **STEWART** and **SIROCKMAN**, caused a co-conspirator who was a Serono clinical consultant to visit the office of Dr. DC, a physician in New Jersey who treated HIV positive and AIDS patients, and to offer Dr. DC the all-expenses paid trip to the Cannes Conference in return for gaining clinical experience with at least thirty (30) Serostim patients before Dr. DC could attend the conference.

### The Offer to Dr. AC

44.    In or about March 1999, the exact dates being unknown, various co-conspirators, including defendants **BRUENS** and **STEWART**, caused defendant **SIROCKMAN** to contact Dr. AC, a physician in New Jersey who treated HIV positive and AIDS patients, and to offer to him the all-expenses paid trip to the Cannes Conference in return for writing of additional prescriptions of Serostim.

45.    On or about April 15, 1999, various co-conspirators, including defendants **BRUENS**, **STEWART** and **SIROCKMAN**, caused Dr. AC to receive a check in the amount of $4,000 for airline tickets.

46. On or about April 25, 1999, defendant **SIROCKMAN**, using his corporate expense account, paid for Dr. AC's transportation in a private limo service for Dr. AC's return to his residence from an airport in New York after the Cannes Conference.

### **The New York Doctors**

47. Between on or about March 1, 1999 and on or about March 4, 1999, various co-conspirators, including defendants **BRUENS** and **STEWART**, caused Adam Stupak to visit the office of Dr. O, a physician in New York City who treated HIV positive and AIDS patients, and to offer Dr. O the trip to the Cannes Conference in return for his writing at least 10 additional prescriptions of Serostim.

48. Between on or about March 1, 1999 and on or about March 4, 1999, various co-conspirators, including defendants **BRUENS** and **STEWART**, caused Adam Stupak to visit the office of Dr. G, a physician in New York City who treated HIV positive and AIDS patient, and to offer Dr. G the trip to the Cannes Conference in return for his writing at least 10 additional prescriptions of Serostim.

49. Between on or about March 1, 1999 and on or about March 4, 1999, various co-conspirators, including defendants **BRUENS** and **STEWART**, caused Adam Stupak to visit the office of Dr. W, a physician in New York City who treated HIV positive and AIDS patients, and to offer Dr. W the all-expenses paid trip to the Cannes Conference in return for his writing at least 10 additional prescriptions of Serostim.

50. On or about April 15, 1999, various co-conspirators including defendants **BRUENS** and **STEWART**, and Adam Stupak, caused a $4,000 check for airline

tickets to be issued to Dr. W, who had accepted the offer for the all-expenses paid trip to the Cannes Conference.

**Further Overt Acts by BRUENS**

51.   In or about March 15-19, 1999, during a presentation at Serono's National Sales meeting, defendant **BRUENS** announced the names of ten (10) physicians who were "US Invitees" to the Cannes Conference, including Dr. P in Florida; Dr. AC in New Jersey; and Drs. O, G and W in New York.

52.   On or about April 24, 1999, defendant **BRUENS** charged 41030.00 French Francs ($6,733.02) on his corporate credit card for expenses incurred at the Moulin De Mougins as part of the entertainment for the physicians and their guests who attended the Cannes Conference.

All in violation of Title 18 United States Code, Section 371.

**COUNT TWO**
**(OFFER OF REMUNERATION TO PHYSICIANS)**

53.    The allegations set forth in Paragraphs 1-21, 33-36 & 37 are herein realleged and

incorporated by reference.

54.    Between on or about March 1, 1999, and on or about March 3, 1999, in the

District of Massachusetts and elsewhere, defendants

**JOHN BRUENS,**
**MARY STEWART,** and
**MELISSA VAUGHN**

did knowingly and willfully cause to be offered remuneration, directly and

indirectly, overtly and covertly, in cash and in kind, to Dr. RL to induce Dr. RL to

refer individuals, including Medicaid patients, to pharmacies for the furnishing of

the drug Serostim, for which payments were made in whole and in part under

state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNT THREE
### (OFFER AND PAYMENT OF REMUNERATION TO PHYSICIANS)

55.    The allegations set forth in Paragraphs 1-21, 33-36, 38 & 41-42 are herein

realleged and incorporated by reference.

56.    Between on or about March 1, 1999, and in or about December of 1999, in the

District of Massachusetts sand elsewhere, defendants

**JOHN BRUENS,**
**MARY STEWART,** and
**MELISSA VAUGHN**

did knowingly and willfully offer and pay, and cause to be offered and paid,

remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to

Dr. P to induce Dr. P to refer individuals, including Medicaid patients, to

pharmacies for the furnishing of the drug Serostim, for which payments were

made in whole and in part under state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

**COUNT FOUR**
**(OFFER OF REMUNERATION TO PHYSICIANS)**

57.    The allegations set forth in Paragraphs 1-21, 33-36 & 43 are herein realleged and

incorporated by reference.

58.    In or about March of 1999, the exact dates being unknown, in the District of

Massachusetts and elsewhere, defendants

**JOHN BRUENS,**
**MARY STEWART,** and
**MARC SIROCKMAN**

did knowingly and willfully cause to be offered remuneration, directly and

indirectly, overtly and covertly, in cash and in kind, to Dr. DC to induce Dr. DC

to refer individuals, including Medicaid patients, to pharmacies for the furnishing

of the drug Serostim, for which payments were made in whole and in part under

state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNT FIVE
## (OFFER AND PAYMENT OF REMUNERATION TO PHYSICIANS)

59.    The allegations set forth in Paragraphs 1-21, 33-36 & 44-46 are herein realleged and incorporated by reference.

60.    Between on or about March 1, 1999, and in or about December, 1999, in the District of Massachusetts and elsewhere, defendants

**JOHN BRUENS,**
**MARY STEWART,** and
**MARC SIROCKMAN**

did knowingly and willfully offer and pay, and cause to be offered and paid, remuneration, directly and indirectly, overtly and covertly, in cash and in kind, to Dr. AC to induce Dr. AC to refer individuals, including Medicaid patients, to pharmacies for the furnishing of the drug Serostim, for which payments were made in whole and in part under state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNT SIX
## (OFFER OF REMUNERATION TO PHYSICIANS)

61. The allegations set forth in Paragraphs 1-21, 33-36 & 47 are herein realleged and

incorporated by reference.

62. Between on or about March 1, 1999, and on or about March 4, 1999, in the

District of Massachusetts and elsewhere, defendants

**JOHN BRUENS** and
**MARY STEWART**

did knowingly and willfully cause to be offered remuneration, directly and

indirectly, overtly and covertly, in cash and in kind, to Dr. O to induce Dr. O to

refer individuals, including Medicaid patients, to pharmacies for the furnishing of

the drug Serostim, for which payments were made in whole and in part under

state Medicaid programs.

  All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNT SEVEN
## (OFFER OF REMUNERATION TO PHYSICIANS)

63.     The allegations set forth in Paragraphs 1-21, 33-36 & 48 are herein realleged and

incorporated by reference.

64.     Between on or about March 1, 1999, and on or about March 4, 1999, in the

District of Massachusetts and elsewhere, defendants

**JOHN BRUENS** and
**MARY STEWART**

did knowingly and willfully cause to be offered remuneration, directly and

indirectly, overtly and covertly, in cash and in kind, to Dr. G to induce Dr. G to

refer individuals, including Medicaid patients, to pharmacies for the furnishing of

the drug Serostim, for which payments were made in whole and in part under

state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNT EIGHT
### (OFFER AND PAYMENT OF REMUNERATION TO PHYSICIANS)

65.    The allegations set forth in Paragraphs 1-21, 33-36 & 49-50 are herein realleged

and incorporated by reference.

66.    Between on or about March 1, 1999, and on or about April 15, 1999, in the

District of Massachusetts and elsewhere, defendants

**JOHN BRUENS** and
**MARY STEWART**

did knowingly and willfully cause to be offered and paid, remuneration, directly

and indirectly, overtly and covertly, in cash and in kind, to Dr. W to induce Dr. W

to refer individuals, including Medicaid patients, to pharmacies for the furnishing

of the drug Serostim, for which payments were made in whole and in part under

state Medicaid programs.

All in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(A), and Title 18, United States Code, Section 2.

A TRUE BILL

_____

FOREPERSON OF THE GRAND JURY

_____

ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; April 14, 2005

Returned into the District Court by the Grand Jurors and filed.

_____

DEPUTY CLERK