# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------------- X
                                                   :
UNITED STATES OF AMERICA,                          :
                                                   :
                                                   :
                    vs.                            :   Criminal No. 05-10102-JLT
                                                   :
JOHN BRUENS, ET AL.                                :
                                                   :
                         Defendants.               :
                                                   :
------------------------------------------------------------- X
```

## DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE A
## PORTION OF MARY STEWART'S MARCH 6, 2002 STATEMENT TO THE FBI

SIDLEY AUSTIN LLP
Thomas McC. Souther, Esq.
    (admitted *pro hac vice*)
Roger J. Hawke, Esq.
    (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Counsel for John Bruens*

MORRISON & FOERSTER LLP
Adam Hoffinger, Esq.
    (admitted *pro hac vice*)
James M. Sullivan, Esq.
    (admitted *pro hac vice*)
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20008-1888
(202) 887-1500

*Counsel for Melissa Vaughn*

HARTMANN, DOHERTY,
    ROSA & BERMAN, P.C.
Mark A. Berman, Esq.
    (admitted *pro hac vice*)
126 State Street
Hackensack, NJ 07601
(201) 441-9056

*Counsel for Mary Stewart*

MINTZ, LEVIN, COHN, FERRIS,
    GLOVSKY & POPEO, P.C.
Tracy A. Miner, Esq. BBO # 547137
McKenzie E. Webster, Esq. BBO #651204
One Financial Center
Boston, Massachusetts 02110
(617) 542-6000

*Counsel for Marc Sirockman*

Pursuant to Federal Rule of Evidence 802, Defendants John Bruens, Mary Stewart, Melissa Vaughn, and Marc Sirockman (collectively, "Defendants") respectfully move this Court for an order, *in limine*, to exclude the editorial comments that were inserted, under the guise of redaction, into a statement made by Stewart to the FBI on March 6, 2002 (the "Stewart Statement").

## PRELIMINARY STATEMENT

In its brief dated October 17, 2006, filed in opposition to certain Defendants' motion to exclude certain statements by co-defendants, the Government set out original statements of selected FBI interview reports and the Government's proposed redactions to those statements.  See United States' Consolidated Opposition to the Defendants Stewart and Sirockman's Motions for Separate Trials; and Defendants Bruens and Vaughn's Motion to Preclude Admission of Mary Stewart's Statements ("Consolidated Opposition") at 6-9.  One such statement related to an FBI interview of Stewart on March 6, 2002.  The Original and Redacted versions, taken from page 7 of the Government's Consolidated Opposition, are as follows:

| ORIGINAL STATEMENT | REDACTED STATEMENT |
|---|---|
| PAGES 6-7:  STEWART was requested to review and explain the following portion of an E-mail message [footnote omitted]: | The statements on pages 6-7 of the Memorandum of Interview, as follows: |
| [1.]  "Voicemail sent by MELISSA VAUGHN Wednesday, March 3, 1999 regarding JOHN BRUENS offer to pay for certain high writing MDs flight and hotel in Cannes, France in April to attend an HIV Nutrition/Wasting program in exchange for 30 patient Rxs during our 6 day sales blitz." | STEWART remembers this incident **[i.e., the offer to pay for high prescribing physicians' flight and hotel in Cannes, France in April in exchange for 30 patient RXs during the 6 day sales blitz]** and called it **[someone's]** 'momentary lapse of judgement.  STEWART stated, the real intention was not to trade business for a trip to France.  According to STEWART, MELISSA VAUGHN got upset |

1

[2.]  - - "STEWART remembers this incident and called it a 'momentary lapse of judgement by JOHN BRUENS.  STEWART stated, the real intention was not to trade business for a trip to France.  According to STEWART, VAUGHN got upset over this whole idea.  Even though STEWART did not travel on this trip, she was aware that ALEXIS CORAZON, M.D., had traveled to France.  STEWART added, that ALEXIS CORAZON, M.D. was the only physician to accept this offer from SERONO.

Id. at 7.

Paragraph 1 in the left-side column, above, contrary to the FBI agent's representation to Ms. Stewart, was not a "portion of an E-mail message".  Rather, it was an editorial comment made by Kim Jackson (the "Jackson Comment"), which Jackson added as a preface to what has been identified as her transcription of the voicemail message.[1]  See Grand Jury Testimony of Kimberly Jackson on Dec. 9, 2003 at 80, attached hereto as Exhibit A ("That's my typed note. . . .  I'm telling that it's a voicemail sent by Melissa Vaughn . . .").  The FBI interview memo of the Stewart Interview is attached hereto as Exhibit B.  The purported voicemail transcription, with the Jackson Comment, is attached hereto as Exhibit C.

In the oral argument before this Court on January 16, 2007, the parties focused only on paragraph 2, above, specifically the "momentary lapse of judgement" portion of the Stewart Statement.  The Court ruled that that portion was an admission by Stewart and that it was admissible in evidence subject only to Bruens' name being deleted and the term "another individual" substituted.  See January 16, 2007 Order, attached hereto as Exhibit D at 2.  There was no discussion in Court on the admissibility of Paragraph 1 of the Original Statement.  Nor

---

[1] The Government acknowledged that the FBI agent misrepresented the nature of the Jackson Comment to Stewart.  See Consolidated Opposition at 7, n. 2.

was there any discussion of what appears in the Redacted Statement column as a paraphrase of

the Jackson Comment; namely,

> STEWART remembers this incident **[i.e., the offer to pay for high prescribing physicians' flight and hotel in Cannes, France in April in exchange for 30 patient RXs during the 6 day sales blitz].**

This issue was not argued at the January 16th hearing because the Government

had represented in its brief that it would <u>not</u> offer the Jackson Comment in evidence.  <u>See</u>

Consolidated Opposition at 9.  The Government stated in its brief:

> In the redacted form set forth above, the Government will **not** refer to the fact that Stewart was requested to review and explain the following portion of the following, which is Kim Jackson's typed transcription of a voice-mail message (which was incorrectly referred to as an e-mail in the Memorandum of Interview):
>
> 'Voicemail sent by Melissa Vaughn on Wednesday, March 3, 1999 regarding JOHN BRUENS offer to pay for certain high writing MDs flight and hotel in Cannes, France in April to attend an HIV Nutrition/Wasting program in exchange for 30 patient Rxs during our 6 day sales blitz.'

<u>Id.</u> at 9-10 (emphasis in original).

It now appears likely that, contrary to its prior representations, the Government

intends to offer in evidence its paraphrase of the Jackson Comment.[2]  This is completely

improper.  The Jackson Comment is inadmissible either as it appears in the FBI memorandum or

as inserted into the so-called Redacted version of the Stewart Statement.  It is hearsay of a third

---

[2] Before making this motion, counsel for Bruens contacted Assistant U.S. Attorney Mary Elizabeth Carmody to inquire whether the Government intends to offer the statement in evidence, despite its prior representations to the contrary.  Ms. Carmody said she could not comment on the Government's position with respect to this inconsistency, and instead referred counsel to the Court's January 16th Order containing the redacted statement.

party, Kimberly Jackson, and it does not represent an admission by Stewart. It should be excluded from the Stewart Statement.

## ARGUMENT

The Government improperly seeks to put before the jury inadmissible hearsay by Jackson through a purported admission by Stewart. Nothing in the text of Vaughn's voicemail indicates that anyone presented to a doctor a *quid pro quo* offer of a trip to the Cannes Conference in exchange for additional prescriptions. It is only the Jackson Comment that asserts that Vaughn's voicemail relates to "John Bruens [*sic*] offer to pay for certain high writing MDs [*sic*] flight and hotel in Cannes, France . . . in exchange for 30 patient RXs during our 6 day sales blitz." This out-of-court testimonial statement by Jackson is inadmissible hearsay for which there is no exception under the Rules. See Fed. R. Evid. 802. But by inserting the Jackson Comment into the text of the Stewart Statement, which the Government intends to offer against Stewart at trial, the Government is attempting to get this inadmissible hearsay into evidence through the back door.

Typically, redactions such as the one at issue here, made pursuant to Bruton and its progeny, remove from a co-defendant's statement any identifying references to another co-defendant. This Circuit generally requires that references to a co-defendant be replaced by "neutral references, using terms such as 'other individuals' or 'another person'." United States v. Vega Molina, 407 F.3d 511, 519 (1st Cir. 2005). The redacted version of the Stewart Statement accepted by the Court substitutes "another individual's" in place of Bruens' name, in an effort to comply with the requirements of Vega Molina. (See Ex. D at 2.) Defendants respectfully reiterate their objection for the reasons given at oral argument.

The insertion of the Jackson Comment into the Stewart Statement, however, does not even purport to replace an identifying reference to another co-defendant. Rather, the Government simply lifts the words from the out-of-court hearsay of Kimberly Jackson – which incorporates the Government's entire theory of the case – and inserts them into the Stewart Statement.

By offering the Stewart Statement in its altered form, or testimony consistent with these alterations, the Government seeks to introduce Jackson's conclusory hearsay by pretending it is an admission by Stewart. By putting the Jackson Comment into Stewart's mouth by means of an FBI misrepresentation that this was an e-mail that Stewart presumably had received, the Government improperly suggests that when Stewart referred to the "Cannes, France program" – which was nothing more than paying expenses of certain doctors to attend an international HIV conference – she was admitting participation in an alleged conspiracy to send doctors to Cannes "in exchange for 30 patient Rxs" (Ex. C). No such admission is made in Vaughn's voicemail itself or in Stewart's interview. The insertion of this hearsay into the "redacted" statement by Stewart is wholly improper and should not be permitted.

## <u>CONCLUSION</u>

Because the Redacted version of the Stewart Statement contains inadmissible

hearsay by another witness, the Redacted statement – and any testimony consistent with this

version of the statement – is inadmissible pursuant to Rule 802.  Accordingly, Defendants

respectfully move this Court to exclude it from evidence.


Respectfully submitted,

JOHN BRUENS, MARY STEWART,
MELISSA VAUGHN, and MARC SIROCKMAN
by their undersigned attorneys:


  /s/ Thomas McC. Souther             /s/ Mark Berman
Thomas McC. Souther, Esq.          Mark A. Berman, Esq.
    (admitted *pro hac vice*)              (admitted *pro hac vice*)
Roger J. Hawke, Esq.               HARTMANN, DOHERTY,
    (admitted *pro hac vice*)            ROSA & BERMAN, P.C.
SIDLEY AUSTIN LLP                  126 State Street
787 Seventh Avenue                 Hackensack, NJ 07601
New York, New York 10019           (201) 441-9056
(212) 839-5300

*Counsel for John Bruens*          *Counsel for Mary Stewart*


  /s/ Adam Hoffinger                  /s/ Tracy A. Miner
Adam Hoffinger, Esq.               Tracy A. Miner, Esq.  BBO # 547137
    (admitted *pro hac vice*)        McKenzie E. Webster, Esq.  BBO #651204
James M. Sullivan, Esq.            MINTZ, LEVIN, COHN, FERRIS,
    (admitted *pro hac vice*)          GLOVSKY & POPEO, P.C.
MORRISON & FOERSTER LLP            One Financial Center
2000 Pennsylvania Avenue, N.W.     Boston, Massachusetts 02110
Washington, D.C.  20008-1888       (617) 542-6000
(202) 887-1500

*Counsel for Melissa Vaughn*       *Counsel for Marc Sirockman*


Dated:  March 22, 2007

6

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a copy of the foregoing motion was filed electronically in compliance with ECF procedures on this 22nd day of March 2007.

<u>        /s/ Patricia C. Fratto                </u>

# EXHIBIT A

JACKSON - 12/09/03                                    80

1    Boston that you had the, received the voice mail from

2    Melissa Vaughn?

3         A    It would have been on that note, the transcription

4    of that voice mail.  It wasn't handwritten.  It was typed.

5              (Pause.)

6              MS. CARMODY:  I'm sorry.  I apologize for that

7    delay.

8              MS. MILLS:  This was previously marked as--

9              MS. CARMODY:  Previously marked as Grand Jury

10   Exhibit--

11             MS. MILLS:  --No. 22--

12             MS. CARMODY:  --No. 22.

13             BY MS. CARMODY:

14        Q    Is that the handwritten note of your voice mail

15   from Melissa Vaughn on March 3, 1999?

16        A    That's my typed note, and that's my handwriting on

17   the bottom.

18        Q    Okay.  Could you read it for the grand jurors,

19   please?

20        A    The whole thing?

21        Q    Yes.

22        A    Voice mail, I'm telling that it's a voice mail

23   sent by Melissa Vaughn on Wednesday, March 3, 1999,

24   regarding John Bruens' offer to pay for certain high writing

25   physicians' flights and hotel in Cannes, France, in April to

# EXHIBIT B

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/07/2002

      MARY KATHLEEN STEWART, date of birth November 7, 1961,
Social Security Number       , residing at
      , telephone number       , was
apprised to the purpose and identities of the interviewing agents.

      STEWART provided the following information:

      A bachelor's degree in marketing was obtained by STEWART
from NORTHEASTERN UNIVERSITY, located in Boston, Massachusetts.
While attending NORTHEASTERN UNIVERSITY, STEWART participated in
the Co-Op Education Program and was employed at BRISTOL-MEYERS.
This experience influenced STEWART to pursue employment with a
pharmaceutical firm.   During 1997, STEWART attended a two week
executive management program at BABSON COLLEGE, located in
Wellesley, Massachusetts.   Currently, STEWART owns her own
consulting firm, FENG SHUI BOSTON, INC., P.O. Box-368, Pembroke,
Massachusetts, telephone number 781-294-7348.

      In November 1991, STEWART  commenced employment with
SERONO LABORATORIES (SERONO) in California and held the position of
Senior District Sales Manager.   In March, 1994, STEWART moved to
the New England region to assist with marketing SERONO's drug
Saizen.   In 1995, STEWART was re-assigned to assist with SERONO's
drug, Serostim.   While located with SERONO in the New England
region, STEWART held the positions of Regional Director of Sales
and then later, Vice President of Sales.   In June, 2000, STEWART
accepted a severance package from SERONO after being passed over
for the position of Executive Vice President, which was granted to
JAY MOHR.

      A "couple of years" after Serostim had received approval
from the FDA (U.S. Food and Drug Administration), STEWART recalled
hearing that the clinical data submitted to the FDA was
"incorrect."   Also, in 2000, after STEWART had departed SERONO, she
again heard "rumors" that the clinical data submitted by SERONO to
the FDA was not correct.   STEWART stated, she would not have known
if the data to FDA had been "manipulated."   When asked to explain
these rumors that she had heard, STEWART did not respond.   STEWART
added, these "rumors" may have been the end product of people being
angry with SERONO.

---

| Investigation on | 03/06/02 | at Pembroke, MA | |
|---|---|---|---|

| File # 209A-BS-87603-302 | | Date dictated | 03/07/02 |
|---|---|---|---|

  SA CATHY PLESHA/cp
by  SA KIMBERLY VAGOS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

MV 00201

FD-302a (Rev. 10-6-95)

209A-BS-87603-302

Continuation of FD-302 of    MARY KATHLEEN STEWART    , On _33/05/02_ , Page __2__

        After the review of a document entitled, "FDA, Talk
Paper, FDA Approves Drug For AIDS-Wasting," dated August 23, 1996,
STEWART indicated, that this document improved her memory about the
drug, Serostim.  STEWART recalled, initially the FDA rejected a
full approval for Serostim, before granting the drug an accelerated
approval.  Because the FDA granted an accelerated approval, SERONO
would have to conduct additional clinical trials to further
evaluate Serostim.  STEWART stated, she was aware that there was a
delay in these clinical trials, but she did not know the reason for
the delay.

        For this time period, STEWART identified TOM LANG and
MARLENE BOOTH, as the individuals, who were responsible for
SERONO's compliance with FDA regulations.  STEWART noted, that TOM
LANG is currently the President of SERONO.  STEWART identified in
sequential order the following as having held the position of
Medical Director at SERONO:  HAL LANDY, M.D.; BOB KAUFMAN, M.D.;
and JOHN SULLIVAN BULEAUX (phonetic).  NORMA MUURAHAINEN, M.D.,
Ph.D., was identified as the current Medical Director.

        After the review of a memorandum from HISHAM SAMRA,
President of SERONO to JEFF GETTY, and BILL THORNE, representing
ACT UP Golden Gate, dated June 25, 1996, and in particular the
phrases:

                "A yearly range of $30,000 to $36,000 for Serostim
                therapy is considered reasonable by both parties."

                "To a clinical trial program that addresses FDA concerns,
                including determination of the optimal maintenance dose."

STEWART stated, "ideally" patients would only need one course of
Serostim and that makes the "cap" of $36,000.00 "reasonable."
However, as STEWART calculated out loud, one, 12 week course of
treatment would cost a patient about $21,000.00 and anyone who
needed another course of treatment would easily exceed the
$36,000.00 "cap."  According to STEWART, some physicians
continuously prescribed Serostim for their patients, because once
their patients were taken off the drug they would begin to lose
weight.

        According to STEWART, the SEROCARE/NORD Program was an
"umbrella" for patients, who could not afford Serostim.  After the
review of a document entitled, "What The Treatment Continuation
Program Offers You," STEWART stated, that patients were to receive

MV 00202

209A-BS-87603-302

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    MARY KATHLEEN STEWART                    On 03/06/02      Page 3

Serostim "free" after an amount of $36,000.00 had been paid.
STEWART added, that there more stringent requirements for patients
to qualify for the SEROCARE/NORD Program in comparison to other
health plans.  STEWART stated, this was because there was not
enough of Serostim for everyone in the program.  According to
STEWART, only so much Serostim was allotted to the SEROCARE/NORD
Program at any given time and this caused a waiting list or back
log of patients for the drug.  Reportedly, physicians became
frustrated when their patients had to wait for the drug.  STEWART
noted, it was a difficult decision to decide, who needed the drug,
but it was based on medical necessity by SERONO's medical director.
STEWART added, body builders and anti-aging clinics were very
interested in Serostim, but SERONO never "targeted" the
anti-aging clinics or nursing homes.

STEWART was asked to comment on the possibility,
that additional clinical trials for Serostim were delayed by
SERONO, because the trials would indicate that patients were being
over prescribed with 6 milligrams of the drug, considering the
previous trials were based on 4 milligrams of Serostim.  STEWART
replied,  she did not know.

STEWART was asked to explain, what she did when sales
representatives told her that 6 milligrams of Serostim was too
strong of a dosage and patients were complaining about aching body
joints.  STEWART replied, she "would not be surprised," if some
sales representatives did not tell physicians that the number of
prescribed milligrams of Serostim should correlate to a patient's
weight.

During December, 1996, the Serostim Preferred Partners
Program was initiated in order to find pharmacies to dispense
Serostim.  After the review of a document entitled, "Serostim
Preferred Partners, Serono" which listed twelve different
pharmacies, STEWART stated, that this appeared to be an "old list,"
probably from the time period of when Serostim was in the TIND
(Treatment Investigational New Drug) status for FDA approval.  At
some point, STEWART estimated, that there were 20 to 30 pharmacies
which participated in the Serostim Preferred Partners Program.
STEWART could not recall if, STADTLANDERS was the original pharmacy
to dispense Serostim.  STEWART stated, that she assisted with
devising the Sterostim Preferred Partners Program, because SERONO
needed reimbursement for the drug and initial attempts internally
by SERONO to develop a reimbursement program had failed.  According
to STEWART, SERONO eventually discontinued this program in favor of

MV 00203

209A-BS-87603-302

FD-302a (Rev. 10-6-83)

Continuation of FD-302 of   MARY KATHLEEN STEWART    , On 03/06/02    , Page 5

distribution by wholesalers, because the smaller pharmacies could not afford to stock Serostim, due to its high cost.

Pharmacies had to fulfill certain criteria in order to become a Serostim Preferred Partner. STEWART recalled, that there was a document listing this criteria, such as, the pharmacies had to have an expertise in treating individuals which were identified as being HIV positive, have a reimbursement expertise and ability to ship the drug, as well as, have supplies available. Initially, the criteria to identify these pharmacies did not include the dollar amount of Serostim dispensed, because there was no payment history for the drug. STEWART identified, California and then New York, as the first two states to reimburse on Serostim.

The following five individuals were identified by STEWART as being involved with the Serostim Preferred Partner Program: ELLEN FRANKS, who was STEWART's boss; CINDY BELL, who had oversight of marketing; JOHN HAUSS (phonetic), who handled the contracts and RICHARD AZULAY, who was involved with reimbursement.

STEWART stated, that the pharmacies participating in the Serostim Preferred Partners Program received a price discount from SERONO on Serostim. Price discounts were granted because these pharmacies would track the milligram amounts of Serostim dispensed. The bonuses paid by SERONO to its sales representatives were based upon this data. STEWART stated, she did not know, if these price discounts were passed onto MEDICAID, MEDICARE, CHAMPUS or the VETERANS AFFAIRS health benefit programs.

ELLEN FRANKS, as Executive Manager, had oversight of the Serostim Program, to include marketing and reimbursement. STEWART stated, that she was not certain, if FRANKS resigned or was "fired" by SERONO. STEWART believes, that ED PARRA, who was charge of the "trade group," could possibly have knowledge about price discounting. PARRA is currently residing in California. Another individual, whom STEWART believes may have information regarding price discounting is RICHARD AZULAY, who is still employed at SERONO.

As for the reporting of false data by the pharmacies, STEWART stated, she was unaware of any such activities. STEWART recalled, that there was a "gap" one time when the reported amount of Serostim dispensed was larger than the amount of drug manufactured. According to STEWART, this incident was never explained to her, but she thought it might have been a

MV 00204

FD-302a (Rev. 10-6-95)

209A-BS-87603-302

Continuation of FD-302 of    MARY KATHLEEN STEWART    On 03/06/02    Page 5

"distribution problem."  STEWART added, that the data reporting by
the pharmacies was "never exact."

After the review of a document entitled, "Serostim
Pharmacy Data Collection Administrative Fee Agreement," STEWART
stated, she was familiar with TDI Pharmacy located in Pittsburgh,
Pennsylvania, which sold large amounts of Serostim in several
states.  STEWART never met the owner of TDI Pharmacy, TONY GREJDA,
but he was described by some of SERONO's marketing personnel to her
as "obnoxious and pushy."  STEWART recalled, that she received many
complaints about GREJDA, however, when requested to elaborate she
did not provide any detail.

STEWART was requested to review a document entitled,
"Serostim Preferred Partner Program, Background Information," and
in particular the following phrase:

"MEDICAID guidelines prohibit manufactures from providing
incentives or inducements to distributors for products
that are used in a MEDICAID population.  Serostim is
approximately 75% MEDICAID.  The SERONO Legal Team has
advised the discontinuation of the Preferred Partner
Program agreement immediately."

STEWART stated, that "incentives and inducements" referred to the
price discount pharmacies were given by SERONO for reporting the
number of milligrams of Serostim dispensed.  According to STEWART,
the MEDICAID population was "targeted" by SERONO, because largely,
the majority of HIV patients are on MEDICAID.

After the review of a document entitled, "Serostim
Preferred Partner Program, Preferred Provider Impact," STEWART
stated, she did not know the meaning of the phrase, "Loss of
chargeback money (3.75% on purchases)."  STEWART believes, that
RICHARD AZULAY or JEFF HART would be able to explain this phrase.
STEWART indicated, that she did not know KEVIN CAST, because he
arrived at SERONO after she had departed the company.

While STEWART was employed at SERONO, the following
individuals were identified as having the responsibility of
assuring compliance with MEDICAID guidelines: ED PARRA, ELLEN
FRANKS and RICHARD AZULAY.  After STEWART departed SERONO, ISABELLE
STILLGER headed this area under the direction of JAY MOHR.
According to STEWART, STILLGER resigned from SERONO to spend more
time with her children.  JAY MOHR, who resides in Scituate,

MV 00205

209A-BS-87603-302

Massachusetts, departed SERONO within the last six months for a
position with another pharmaceutical firm in Cambridge,
Massachusetts.

When JEFFREY HART, was Vice President of Strategic
Business Intelligence, he had oversight of data and reported this
information to SERONO's management.  Currently HART is assigned to
Customer Service and STEWART added, "surprisingly" he is still
employed at SERONO.  KATHLEEN OGAR was identified as working under
the supervision of HART or MELANIE WILKINS.

Initially, STEWART stated, that she could not recall the
name, ABDULLAH BAAJ.  STEWART believes, that ABDULLAH BAAJ was not
involved with the Serostim Preferred Partners Program, but was
possibly in charge of the Clinical Science Liaison Program.
STEWART had the impression that ABDULLAH BAAJ held a Ph.D. degree
or had a background with some type of medical training.  According
to STEWART, because SERONO did not like the "management style" of
ABDULLAH BAAJ, he was assigned 2 or 3 sales accounts to handle for
SERONO within Boston, Massachusetts, to "keep him busy."

After a review of the document entitled, "Serostim
Preferred Partner Program, Reimbursement Examples," STEWART stated,
that AWP refers to Average Wholesale Price, WAC refers to Wholesale
Acquisition Costs and COT refers to Cost of Treatment.  STEWART
believes, "AWP -5%" may refer to a discount, but she was not
certain.

AWP was identified by STEWART as not being the "real
price," but an inflated price and this is done by everyone within
the industry.  STEWART described AWP as a built in "cushion" to
create a pricing gap, but she could not recall the pricing for
Serostim.  Additionally, STEWART stated, she did not know, if
SERONO reported to the Government an overly inflated AWP or if the
discount price granted to some pharmacies was factored into the AWP
pricing.

STEWART was requested to review and explain the following
portion of an E-mail message:

"Voicemail sent by MELISSA VAUGHN Wednesday, March 3,
1999 regarding JOHN BRUENS offer to pay for certain high
writing MDs flight and hotel in Cannes, France in April
to attend an HIV Nutrition/Wasting program in exchange
for 30 patient RXs during our 6 day sales blitz."

MV 00206

FD-302a (Rev. 10-6-95)

209A-BS-87603-302

Continuation of FD-302 of    MARY KATHLEEN STEWART    On 03/26/02    , Page ____

STEWART remembers this incident and called it a "momentary lapse of judgement" by JOHN BRUENS. STEWART stated, the real intention was not to trade business for a trip to France. According to STEWART, VAUGHN got "upset" over this whole idea. Even though STEWART did not travel on this trip, she was aware that ALEXIS CORAZON M.D., had traveled to France. STEWART added, that ALEXIS CORAZON, M.D., was the only physician to accept this offer from SERONO. Currently, VAUGHN is working for a company in Colorado, and BRUENS is employed by another company in California. SUE WOMBLE, was an Administrative Assistant to BRUENS, who had oversight of the Marketing Department. Currently, SUE WOMBLE is located on the south shore region of Massachusetts.

STEWART was requested to review a memorandum from SUE WOMBLE, Metabolic & Immune Therapy to HOWARD GROSSMAN, M.D., dated March 31, 199(9), and in particular the following phrase:

"Included with this invitation is an offer of a $4,000 grant for the purchase of airline tickets to Cannes. If you decide you would like us to make your flight arrangements for you, in lieu of the grant, we will purchase on your behalf one business class round trip ticket."

STEWART stated, obviously, she was wrong and other physicians had traveled to France.

According to STEWART, SERONO gave physicians "more attention" if they wrote numerous prescriptions for Serostim. STEWART described "attention" as buying physicians dinners, or "attention from SERONO management," but not a monetary compensation.

STEWART stated, that SERONO received "hundreds" of requests from physicians for money; and it was not from the "high writing" physicians as one would suspect. When requested to identify specific physicians, who made such requests, STEWART did not respond. It seemed to STEWART that physicians always wanted "something for nothing." It was quite common, according to STEWART, for physicians to request "educational grants" which paid for their air travel to attend HIV conferences sponsored by SERONO. STEWART stated, she was not certain if these physicians actually ever attended the conferences.

MV 00207

209A-BS-87603-302

The SERNONAIDS Program collects data on HIV patients and AIDS wasting patients.  STEWART advised, that physicians submit data regarding their patients to SERONO, and they are in turn paid $250.00 or $300.00 for each completed form.  SERONO made payments to the physicians on possibly a quarterly or some other pre-determined basis.  Physicians submitted the forms to CINDY BELL and ABDULLAH BAAJ.  The Clinical Science Liaison Program was responsible for recruiting physicians, and they did so by sometimes identifying physicians through published studies.  According to STEWART, all physicians participating in the program had to sign a contract agreement with SERONO.  STEWART was not certain, if the physicians also received a fee for BIA (Bioelectrical Impedance Analysis) testing.  Some physicians, STEWART believes, were "lent" BIA machines in order to perform BIA testing.  ROSS PETTIT, was identified by STEWART as the Director of Medical Services, with oversight of this program.  STEWART identified CINDY BELL as a close friend, who would know more facts about the SERONAIDS Program.  STEWART added, CINDY BELL told her, she anticipates in about 2 weeks, to be "fired" by SERONO.

STEWART identified NORMA MUURAHAINEN, M.D.,Ph.D., as SERONO's current Medical Director and BOB KAUFFMAN, M.D., as the former Medical Director, and both of these individuals had oversight of the SERONAIDS Program.

The purpose of BIA testing is to determine muscle mass and to track muscle mass over a time period.  According to STEWART, sometimes sales representatives of SERONO performed BIA testing on patients by themselves and sometimes with the assistance of medical personnel within the physicians' offices.  Typically, a sales representative would give a print-out of a patient's BIA test results to the physician, who reviewed it and decided, if the patient needed to be prescribed Serostim.  STEWART stated, physicians would enter the BIA test results into the patient's medical record and not the sales representative, even though they may have actually performed the testing.  In some instances, STEWART advised, medical personnel within the physicians' offices would ask the sales representatives to perform the BIA testing, because they were too busy or just did not want to do the testing.  STEWART felt some medical personnel "pushed off" onto the sales representatives.

STEWART believes, there was no reimbursement by insurance programs for BIA testing.  Also, STEWART is not aware of sales

209A-BS-87603-302

Continuation of FD-302 of     MARY KATHLEEN STEWART _____ , On 03/06/02 , Page 9

representatives telling physicians to bill for BIA testing, even when the testing was not performed by the physicians.

STEWART stated, "it was under" her leadership that some sales representatives, had reviewed patient medical records within physicians' offices in order to identify potential Serostim patients.  According to STEWART, sales representatives were instructed not to do this, because it was not part of SERONO's sales plan.

After a review of the document entitled, Serostim Preferred Partner Program, Preferred Provider Impact," and in particular the phrase:

"Providers will not be held accountable to SERONO's SOP for BIAs etc..."

STEWART believes, that this refers to the pharmacies that performed BIA testing.

JOHN BRUENS and SCOTT LUNDIE (phonetic) from the Marketing Department were identified by STEWART as having had "control" over the BIA machines.  STEWART recalled, that SCOTT LUNDIE, whom she described as "computer literate," once changed the computer programs of the BIA machines and the sales representatives "revolted."  When STEWART was requested for specifics regarding this "modification," she did not respond.

STEWART did not know why or the identity of the individual, who selected CPT codes 93720, 93721 and 93722 for BIA testing.  After a review of the CPT descriptions for the previous mentioned codes, STEWART stated, that these codes do not seem appropriate for BIA testing, because of the reference to respiratory.  STEWART believes, RICHARD AZULAY, who has oversight of insurance reimbursement may be able to answer this question.

A document entitled, "BIA Fluid - Nutrition Assessment" was identified by STEWART as the form to record patient data measurements from BIA testing.  In BIA testing, electrodes are placed on the patient's body which generates data.  The sales representative would then load this data into the physician's computer.  STEWART stated, "adjusting" or "fudging" data was not condoned by SERONO.  According to STEWART, if any data was changed, such as the phase angle, the data would not be accurate.

MV 00209

209A-BS-87603-302

Continuation of FD-302 of    MARY KATHLEEN STEWART _____ . On 03/06/02 ____ . Page ____ 10 ____

       After the review of a document entitled, Metabolic & Immune Therapy, MARY STEWART, Vice President, Sales," STEWART stated, that a "couple" of sales representatives "stood out in her mind."  However, STEWART would not identify these individuals.

       STEWART was requested to review a document entitled, "Feedback on MARC SIROCKMAN."  Upon review STEWART stated, she was the one who had requested that MARC SIROCKMAN's employment with SERONO be terminated because of his "business practices."  MARC SIROCKMAN worked in New Jersey and was a close, personal friend to ALEXIS CORAZON, M.D.  According to STEWART, there were "rumors" that MARC SIROCKMAN had "manipulated" grant money without authorization.  When MARC SIROCKMAN was approached by SERONO, he denied all allegations.  STEWART described MARC SIROCKMAN as being "aggressive, too pushy" and "a cowboy, on his own, doing his stuff."  Recently, STEWART advised, she had been contacted by MARC SIROCKMAN, who requested she provide an employment reference for him.  STEWART added, no one has contacted her to date.

       STEWART offered the following information regarding various SERONO sales representatives:

           RAY HUDGENS was located in Florida, and STEWART had not heard his reported claim, if the phase angle of BIA test results were changed to the number 7, rather than the number 6, more patients would need Serostim.  STEWART remembers RAY HUDGENS as a "consistent performer," who worked for either MELISSA VAUGHN or DAVE SAWIN, who were respectively Executive Area Directors.

           ANGELO SAVERINO was located in Bronx, New York, and STEWART recalled nothing negative about SAVERINO, she described him as "quiet, low profile, not great sales and not a consistent performer."  ANGELO SAVERINO was under the direction of ADAM STUPAK, who often had sales incentives for his sales representatives.

           TODD SULLIVAN was located in New Jersey, and STEWART described him as being "very aggressive, someone she never trusted and sleazy."  STEWART stated, she had no specific reasons for not trusting TODD SULLIVAN.

           TODD MIKOLAJCZYK was also located in New Jersey and STEWART described him as an "OK guy."

MV 00210

209A-BS-87603-302

Continuation of FD-302 of  MARY KATHLEEN STEWART  , On 03/06/02  , Page  11

> PHIL BLACK was located in California, and STEWART was
> "shocked" when she heard he had been terminated by SERONO
> for doing something wrong regarding a hospital. STEWART
> stated, she could not recall the details regarding
> PHIL BLACK.

According to STEWART, there is so much jealousy among sales
representatives that this often made it difficult to discriminate
between truth and jealousy. STEWART offered the opinion that
MELISSA VAUGHN, DAVE SAWIN and VANCE LNU (Last Name Unknown) were
"sacrificial lambs," who were terminated by SERONO.

> STEWART stated, she had "only heard" about ABDULLAH
> BAAJ's "open label study" of prescribing Serostim in the treatment
> of lipodystrophy, and that the study had to be discontinued.
> After the review of a document entitled, "An Open Label Study to
> Determine the Effect of Low Dose Growth Hormone on Visceral Fat
> Accumulation in HIV-Infected Patients," STEWART stated, that
> this document had to be an early draft of the final paper. After
> the review of a document entitled, "SERONO, Notice of Compliance,"
> STEWART stated, that this was for the recall of promotional
> literature. Since ABDULLAH BAAJ had only been given
> 2 or 3 accounts in Boston, Massachusetts, STEWART identified,
> CHRISTINE DRISCOLL and TODD WILLINDER, both sales representatives,
> as individuals who would have knowledge regarding ABDULLAH BAAJ's
> lipodystrophy study. STEWART believes, ABDULLAH BAAJ's "open label
> study" was limited to these 2 or 3 accounts in Boston. STEWART was
> not certain, if any information from this study was ever entered
> into the SERONAIDS Program nor the reason that ABDULLAH BAAJ
> departed SERONO. CHRISTINE DRISCOLL was identified as still
> employed at SERONO, but someone who has been talking for sometime
> while of leaving SERONO.

> As for the drug, Serostim, STEWART stated, she "believes"
> that the drug has "saved" many peoples' lives. Also, STEWART told
> of participating in telephone hot-line calls regarding AIDS and
> that she heard much "positive feed-back" from patients regarding
> Serostim.

> Before STEWART departed SERONO, she was put on an
> "International Team" for Serostim and traveled almost on a weekly
> basis between Massachusetts and Switzerland. According to STEWART,
> she believes this assignment was given to her in consolation for
> being passed over for the position of Executive Vice President,
> which was granted to JAY MOHR. Eventually, STEWART stated, all the

MV 00211

209A-BS-87603-302

Continuation of FD-302 of   MARY KATHLEEN STEWART   , On 03/06/02   , Page  12

traveling made it too difficult for her, and she decided to resign her position with SERONO.

EXHIBIT C

Voicemail sent by Melissa Vaughn Wednesday, March 3, 1999 regarding John Bruens offer to pay for certain high writing MDs flight and hotel in Cannes, France in April to attend an HIV Nutrition/Wasting program in exchange for 30 patient Rxs during our 6 day sales blitz

"Hey guys - This message is going to the RDs and I'm going to copy Mary Stewart and John Bruens on this. I just had a couple of very sobering phone calls from two of my CCs who presented the Cannes, France program and I can tell you that they presented it in one of the best ways we could possibly present it. They presented it to doctors with whom they have excellent relationships and rapport, who are also top doctors and who had the potential to bring in 30 scrips for the next week or so, and who also would have been perfect for speaking, and so we had everything laid out perfectly – it was the perfect scenario.

"These individuals each called me literally within five minutes of each other and could not express to me the horrible experience they went through and the things that were said to them by their doctors about this program: that it was unethical, that this is the very thing that the FDA looks for, that our drug is too good, our reputation is too good, our clinical consultants work too hard and the reputation is too positive to be stooping to such levels – why is Serono doing this? It just wasn't good – it was not good. I can't express it enough. I just wanted to let you know that we will not be doing this program in the south. We will get business, we will do what we need to do, but we won't go to desperate means that will compromise who we are as a company and who we are as individuals because I'm very proud of who we are and our product and essentially everything we represent as a company and as a product. I thought I'd pass this on to you just to give you some feedback and let you make your own decisions, but it was important enough for me to send it to the group.'"

Ray Hudgens and Adam Whitehurst were the CCs who asked the physicians. One MD was Dr. Piperato.

JB 009798

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,     *
    *
v.     *     Criminal No. 05-10102-JLT
    *
JOHN BRUENS, MARY STEWART,     *
MELISSA VAUGHN, and     *
MARC SIROCKMAN,     *
    *
    Defendants.     *

## ORDER

January 16, 2007

TAURO, J.

After a Motion Hearing held on January 16, 2007, this court hereby orders that:

1.  Defendants' Joint MOTION to Strike the Surplusage in the Indictment Pursuant to Rule 7(d) [#62] is DENIED.

2.  Defendants' Joint MOTION to Sever Counts as to John Bruens, Mary Stewart, Melissa Vaughn, Marc Sirockman.[#66] is DENIED.

3.  Defendant Sirockman's MOTION to Sever Defendant Sirockman from Trial [#61] is DENIED.

4.  Defendant Mary Stewart's Motion for Separate Trial [#70] is DENIED.

5.  Defendant Bruens's and Defendant Vaughn's Joint MOTION to Preclude Statements Made by Co-Defendant Mary Stewart [#68] is DENIED.

6.  In accordance with the First Circuit Court of Appeals's decision in Vega Molina,[1]

---

[1] United States v. Vega Molina, 407 F.3d 511 (1st Cir. 2005).

Marc Sirockman's December 13, 2001, statement and Mary Stewart's March 6,

2002, statement shall be redacted as proposed by the Government in its

Consolidated Opposition [#74], with the following modifications.

Marc Sirockman's December 13, 2001, statement to investigators of the State of
New Jersey:

> Only doctors who exceeded their normal prescription rate
> by a certain percentage were considered for attendance.
> Sirockman did not know the specific figure but thought that
> it might have been ten percent. . . . **[Other individuals]**
> selected the doctors who attended "Con France." Serono
> paid for all expenses (air fare, hotel, and meals), and also
> provided the doctors with spending money.

Mary Stewart's March 6, 2002, statement to the FBI:

> STEWART remembers this incident **[i.e., the offer to pay
> for certain high writing physicians' flight and hotel in
> Cannes, France in April to attend an HIV
> Nutrition/Wasting program in exchange for 30 patient
> RXs during the 6 day sales blitz]** and called it **[another
> individual's]** 'momentary lapse of judgement.' Stewart
> stated, the real intention was not to trade business for a trip
> to France. According to STEWART, MELISSA
> VAUGHN got upset over this whole idea. Even though
> STEWART did not travel on this trip, she was aware that
> ALEXIS CORAZON, M.D., had traveled to France.
> STEWART added, that ALEXIS CORAZON, M.D. was
> the only physician to accept this offer from SERONO.

This court will not redact Mary Stewart's statement about Alexis Corazon because

that statement alone does not incriminate other co-defendants.[2]

---

[2] See id. at 520 (citing Richardson v. Marsh, 481 U.S. 200, 208, (1987)) ("Statements that
are incriminating only when linked to other evidence in the case do not trigger application of
Bruton's preclusionary rule.").

7.     A trial order will issue.

IT IS SO ORDERED.


                                    ___/s/ Joseph L. Tauro_____
                                    United States District Judge