UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                              )
UNITED STATES OF AMERICA            )
                                                              )         NO.  05-CR-10102 JLT
                                                              )
v.                                                           )
                                                              )
JOHN BRUENS, MARY STEWART,   )
MELISSA VAUGHN, and                    )
MARC SIROCKMAN                            )
                                                              )
              Defendants.                            )
_____)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR FED. R. CRIM. P. 29 MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 5 OF THE INDICTMENT FOR LACK OF ANY EVIDENCE OF ANY OFFER TO DR. CORAZON**

The Government has failed to meet its burden of presenting evidence by which a reasonable trier of fact could find that Defendants John Bruens, Mary Stewart, and Marc Sirockman (the "Defendants") are guilty beyond a reasonable doubt of knowingly and willfully violating the anti-kickback statute as alleged in Count 5 of the Indictment, by making a quid pro quo offer to Dr. Corazon to induce him to increase his prescribing of Serostim. 42 U.S.C § 1320a-7b. No Serono representative testified that such an offer was made to Dr. Corazon with respect to the Cannes conference and Dr. Corazon has not testified that he received any offer from anybody with respect to his attendance at the Cannes conference. Rather, as detailed herein, the only evidence presented regarding Dr. Corazon was that he was both a high prescriber and he attended the Cannes conference at Serono's expense. Both are facts that Defendants do not dispute, and more importantly, they are facts that do not in and of themselves constitute a

1

crime. Therefore, a judgment of acquittal must be entered on Count 5 pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure.

I.    **LEGAL STANDARD**

A judgment of acquittal must enter for the Defendants on Count 5 because the Government's evidence has failed to prove all of the essential elements of the count beyond a reasonable doubt. In the First Circuit, a trial court considering a motion for judgment of acquittal under Rule 29 must determine "'whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998) (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)). The trial court must "'consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.'" Id. (quoting United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997)).

II.   **THE GOVERNMENT HAS NOT SHOWN THAT ANY QUID PRO QUO OFFER WAS MADE TO DR. CORAZON**

The prosecution has not shown *any* evidence relating to an essential element of the crime charged in Count 5—that either Mr. Bruens, Ms. Stewart, or Mr. Sirockman "did knowingly and willfully offer and pay" Dr. Corazon to induce him to write more prescriptions of Serostim. At best, even taken in the light most favorable to the Government, the evidence has shown only that Dr. Corazon went on a trip to Cannes that was paid for by Serono. None of the Government's witnesses has testified that the offer was a quid pro quo—that is, that Mr. Sirockman or anyone

2

else offered to sponsor Dr. Corazon's trip to the Cannes conference *in return for* writing prescriptions for Serostim.

Attached to this memorandum at Appendix A is an excerpted list of all of the testimony that references Dr. Corazon. Even a cursory review of Appendix A demonstrates that the Government has elicited very little testimony relating to Dr. Corazon over the course of its case-in-chief. A review of the testimony itself reveals an obvious and crucial defect in the Government's proof as to Count 5—none of this testimony shows, via direct or circumstantial evidence, that the Defendants made a quid pro quo offer to Dr. Corazon to induce him to write prescriptions of Serostim. The testimony has been limited to the following evidence relating to Dr. Corazon.

- Dr. Corazon was a top prescriber of Serostim. See Jackson testimony, Day 2, Tr. 166:18-25.

- Dr. Corazon was Mr. Sirockman's account. See Aromando testimony, Day 4, Tr. 32:25 to 33:21.

- Dr. Corazon was an important account for Serono, and Serono supported him in various programs. See Hart testimony, Day 4, Tr. 228:11 to 235:5.

- Dr. Corazon wrote fewer Serostim prescriptions in March of 1999, the time period of the alleged inducement, than he did in December 1998. See Hart testimony, Day 4, Tr. 228:11 to 235:5.

- Serono paid for Dr. Corazon's attendance at the Cannes conference. See Womble testimony, Day 7, Tr. 192:10-195:1.

- Dr. Corazon was a Medicaid prescriber in New Jersey in 1999. See English testimony, Day 8, Tr. 84:20-86:2.

This testimony, taken in the light most favorable to the prosecution, and together with all reasonable inferences that may be drawn from it, is legally insufficient to permit a rational jury to find every essential element of the anti-kickback statute violation charged in Count 5 beyond a reasonable doubt. See Caroll, 105 F.3d at 742 (describing the legal standard under Rule 29

3

necessary to sustain a conviction). Not one witness testified that any of the Defendants conditioned Dr. Corazon's invitation to the Cannes conference upon his agreement to prescribe Serostim. One cannot infer an offer from the mere fact of Dr. Corazon's attendance at the Cannes conference; indeed we know from the testimony of William Frye and Dr. Cantey that Dr. Cantey attended the conference at Serono's invitation and yet his trip was not conditioned upon his writing any additional prescriptions. Because the evidence is insufficient to establish beyond a reasonable doubt that the Defendants made a quid pro quo offer to Dr. Corazon, this Court lacks the legitimate discretion to allow the jury to decide Count 5, and a judgment of acquittal must be entered. See United States v. Pappathanasi, 383 F. Supp. 2d 289, 291 (D. Mass. 2005) (Wolf, J.) (holding that Rule 29 expressly requires a trial judge to enter a verdict of acquittal where the evidence is insufficient to sustain a guilty verdict).

### III.    CONCLUSION

The evidence as presented in the Government's case-in-chief has not established that the Defendants made a quid pro quo offer to Dr. Corazon as alleged in Count 5 of the Indictment. Consequently, for the reasons described above, under Rule 29 of the Federal Rules of Criminal Procedure, a judgment of acquittal must enter for the Defendants on Count 5 of the Indictment.

WHEREFORE, for the foregoing reasons, the Defendants respectfully request that this Court enter a judgment of acquittal on Count 5 of the Indictment.

Respectfully submitted,

**JOHN BRUENS, MARY STEWART,
and MARC SIROCKMAN,**

By their undersigned attorneys.

| | |
|---|---|
| /s/ McKenzie E. Webster | /s/ Thomas McC. Souther |
| Tracy A. Miner | Thomas McC. Souther |
| McKenzie E. Webster | Counsel for John Bruens |
| Counsel for Marc Sirockman | |

/s/ Mark. A. Berman
Mark A. Berman
Counsel for Mary Stewart

**Dated:** May 1, 2007

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing motion was filed electronically in compliance with ECF procedures on this 1st day of May 2007.

/s/ McKenzie Webster

4028668v.1

5

## Appendix A

## Corazon References in Witness Testimony

**Kim Jackson Testimony**

[Regarding Exhibit 23]

Q. And please turn to the third page of this document. Can you tell from the third graph what this -- where this document -- where this region is?

A. This is New Jersey, Rhode Island, Connecticut, Massachusetts, a little bit of Pennsylvania. Rhode Island I said.

Q. And who is the first doctor listed on this page?

A. Dr. Corazon.

Day 2 166:18-25.

Q. And Dr. Anderson was, oftentimes, the highest-prescribing doctor?

A. Yes.

Q. He was competing with Dr. Corazon. Does that name sound familiar to you --

A. Yes.

Q. -- as a high-prescriber?

A. Yes.

Day 3 155:7-17.

**Jeffrey Aromando Testimony**

Q. Okay. Do you recall whether Mr. Sirockman mentioned another doctor?

A. Yes, there was the other doctor. If you recall, I had said there were two doctors within our state of New Jersey who were being selected to participate. The other doctor was from the northern part of the state outside of my area.

Q. Did he say who the other doctor was?

A. Dr. Corazon.

Q. Were you familiar with the name "Dr. Corazon" at the time?

A. Yes.

Q. How?

A. Through -- well, I was familiar with him in the context of him being one of the higher prescribers of Serostim, and his name was frequently mentioned as a strong advocate of the product.

Appendix A
Corazon References in Witness Testimony

> Q. Do you know if there was any particular employee in Serono who had Dr. Corazon as an account?
>
> A. Yes. Before Marc Sirockman was promoted it was his account, and then after he was promoted, I'm not sure who covered him.

Day 4 32:25 to 33:21.

**Jeffrey Hart Testimony**

> Q. And directing your attention to the first few lines across --
>
> If we could just blow that up for the jurors, please all the way across. How about if we do it half at a time.
>
> And who is the top doctor listed on that sheet?
>
> A. Dr. Corazon.

Day 4 136:21 to 137:2

> Q. And directing your attention to this document --
>
> Again, this is [Exhibit] 59G, the top row.
>
> Sot he document that we're looking at now is 59G and it says -- and it's from Marc Sirockman to that group, "Subject: 6 million tracking"; is that correct?
>
> A. Yes.
>
> Q. And going to the second page of that document to the top of the page --
>
> If we could enlarge that top line across, please.
>
> -- and directing your attention to the top line, is the first line still Dr. Corazon?
>
> A. Yes.
>
> Q. And going to the section that reports the number of scripts per day, can you read across the dates and the amount of scripts reported as written by Dr. Corazon for that time period?
>
> A. March 2, ten; March 3, seven, March 4, five; March 5, eight; March 6, March 7, none; March 8, eight; March 9, eight; March 10, seven; March 11, six.
>
> Q. And is there a total plan to date on that column?
>
> A. There isn't.
>
> Q. Can you add those numbers up?
>
> A. It appears to be 59.

Day 4 139:4 to 140:1.

> Q. … Look at [Exhibit] 59F, if you would. That's the daily report from Marc Sirockman, correct?
>
> A. Yes.

2

Appendix A
Corazon References in Witness Testimony

> Q. And that was sent on March 10 of '99; is that right?
>
> A. Yes.
>
> Q. And if you go to the second page on that daily report, it shows the first line, Dr. Corazon -- I believe Ms. Carmody went through these already -- Dr. Corazon wrote a number of prescriptions, in excess of 50 over the course of the days reported here, correct?
>
> A. This sheet doesn't have a total.
>
> Q: But if you -- I think Ms. Carmody actually asked you to do the arithmetic, and we came up with the number; is that right?
>
> A. Yes, roughly 50.
>
> Q. But just to the left of the column that says "3/1," which doesn't have an entry in it, is the entry for the total number of prescriptions that Dr. Corazon wrote in the 12-month period prior to 19 -- March of 1999, correct?
>
> A. Yes.
>
> Q. What's that number?
>
> A. 615.
>
> Q. He was one of the largest prescription writers in the country?
>
> A. Yes.

Day 4 217:13 to 218:14.

> Q. … Now, we talked a little bit about Dr. Corazon here this afternoon. Are you familiar with Dr. Corazon?
>
> A. I know of him.
>
> Q. Are you familiar with the name?
>
> A. I am familiar with the name.
>
> Q. And are you aware that he was one of Serono's top prescribers?
>
> A. Yes.
>
> Q. Do you recall that he was identified -- or referred to as being called a key account?
>
> A. Yes.
>
> Q. And that he had roughly -- you know, quite a large patient clinic in New Jersey?
>
> A. Yes.
>
> Q. Roughly 1,500 patients?
>
> A. It could be.
>
> Q. He obviously was one of the top prescribers that the company wanted to keep happy; is that right?

Appendix A
Corazon References in Witness Testimony

A. Yes.

Q. And the company supported him in various programs, correct?

A. I believe so.

Q. Called on him often with sales reps?

A. Yes.

Q. Supported the program such as the patient aware program?

A. Could be. I'm not aware.

Q. And any advisory panel participation?

A. He may have.

\* \* \* \* \*

THE WITNESS: This appears to be part of the presentation from the national sales meeting in March.

BY MS. WEBSTER:

Q. Does that refresh your recollection as to some sort of -- the programs that Serono supported Dr. Corazon with?

A. If it's on there, yes.

Q. Thank you. So it's no surprise to you that if they were sending top prescribers to a conference in Cannes, that Dr. Corazon would be somebody who would be invited?

A. No.

MS. CARMODY: Objection.

THE COURT: I'll let her have it.

BY MS. CARMODY:

Q. And he was already writing significant prescriptions in '99 and '98; is that correct?

A. Yes.

Q. I'd like to show you what's been marked as Defendants' Exhibit Z, and I agree that this -- I believe that this was an agreed-upon exhibit.

\* \* \* \* \*

Q. And can you tell me what this document is?

A. It's a top 20 Serosti[m] subscriber retail report.

Q. As of what date? Can you not read it? We can --

A. No. No. It ends in February of '99.

Q. If you look at the top -- we've highlighted the top of it for you.

Appendix A
Corazon References in Witness Testimony

| | | |
|---|---|---|
| A. | May of '99. February through May. | |
| Q. | And on the -- if you look at the -- eight doctors down, it's Dr. Corazon. Could you... | |
| | Do you see the numbers there? | |
| A. | Yes. | |
| Q. | We've put together a little graph up on the screen, which will hopefully explain it better. If you could look all of the way to the right, do you see on the column it says "Serosti[m]," "Milligrams," "Quantity," December 1998"? | |
| A. | Yes. | |
| Q. | Do you see that? | |
| A. | Yes. | |
| Q. | And what is the number for Dr. Corazon for milligrams? | |
| A. | 8,941. | |
| Q. | And the column over that represents the number of prescriptions; is that correct? | |
| A. | The one to the left, yes. | |
| Q. | I'm sorry. To the left, yes. And how many prescriptions was that for December of 1998? | |
| A. | 109. | |
| Q. | And would you go over and look at the number of prescriptions written in January 1999. Could you read what that reads, please? | |
| A. | 86. | |
| Q. | And for number of prescriptions written in February of 1999? | |
| A. | 93. | |
| Q. | And finally, the number of prescriptions written in March of '99? | |
| A. | 99. | |
| Q. | So his prescription writing seemed to rise a little bit at the end of the quarter; is that right? | |
| A. | Yes. | |
| Q. | But in March there were six more prescriptions written than in February? | |
| A. | Yes. | |
| Q. | And actually the number of prescriptions written in March was 10 prescriptions less than that of December of 1998; is that correct? | |
| A. | Sixteen. | |
| Q. | Sixteen? I'm sorry. 109 minus 99 is 10 different -- | |
| A. | 190/93. | |

5

Appendix A
Corazon References in Witness Testimony

> Q. I'm sorry. I'm comparing December of 1998 to March of 1999.
>
> A. That is 10. Sorry.
>
> Q. Thank you. Now, you testified on direct that during -- and looking at those daily tracking reports -- that Dr. Corazon wrote approximately 59 prescriptions in the first seven weeks, to March of 1999?
>
> A. We don't have weekly data.
>
> Q. I'm sorry. That was what was reported as him having written on those daily tracking reports for the first seven weeks of 1999, was the number 59?
>
> A. The first days.
>
> Q. The first days? Yes. Well, it went up through March 11; is that correct?
>
> A. Right.
>
> Q. So if he wrote 99 for all of March -- for the entire month of March and 59 in the first 11 days of March, how many would he have written -- well, let me do the math for you -- he would have written approximately 40 for the last half of March; is that correct?
>
> A. This represents total prescriptions --
>
> Q. Yes.
>
> A. -- not just new? So you'd have refills and new Rxs built into it. So it's not just a new prescription.
>
>   It's --
>
> Q. So this would actually be an even higher number?
>
> A. Would be a higher number. It would be refills plus new prescriptions.
>
> Q. So this would be the complete number that he wrote for all of March --
>
> A. Yes.

Day 4 228:11 to 235:5.

**Adam Stupak Testimony**

> Q. And who were the biggest writers of Serosti[m] in the State of New Jersey or surrounding?
>
> A. The biggest I can remember is Dr. Corazon. There were a few others. But the names escape me.
>
> Q. And whose customer was Dr. Corazon?
>
> A. Marc Sirockman's.

Day 6 30:11-16.

**Konstantine Pinteris Testimony**

    Q.    Who did you visit?

    A.    We visited Dr. Corazon's office; physicians at UMDNJ, University of Medicine and Dentistry of New Jersey; we visited another physician at another hospital that has a "saint" something name -- I don't remember the name -- and a pharmacy.

    Q.    Let me ask you this with respect to Dr. Corazon: Were you familiar with Dr. Corazon before you visited his office with Mr. Sirockman?

    A.    I'd never met him. I was aware of him.

    Q.    How were you aware of him?

    A.    He was a very high prescriber of Serostim and his name often came up in meetings as being a very high prescriber.

    Q.    And do you know what sales rep was responsible for Dr. Corazon?

MS. MINER: In what period of time, your Honor?

BY MS. POSWISTILO:

    Q.    When you first learned of Dr. Corazon, do you know what sales representative --

    A.    It was Marc.

    Q.    I'm sorry?

    A.    It was Marc Sirockman.

Day 7 14:6-15:12.

**Susan Womble Testimony**

    Q.    And looking at the exhibits, 91 through -- Well, first, let's just look at 91. Can you tell us what 91 is?

    A.    It's a letter -- I'm sorry. It is a letter to Dr. Alexis Corazon, inviting him to be a guest at the conference being held in Cannes, France.

    Q.    And this letter is signed by you; is that --

    A.    That's correct.

    Q.    Do you know who drafted this letter?

    A.    I believe it was John Bruens.

    Q.    And do you recall sending this letter out?

    A.    Yes, I do.

    Q.    And do you recall where you got the name "Alexis Corazon"?

    A.    It was given to me.

    Q.    By whom?

Appendix A
Corazon References in Witness Testimony

A. By John Bruens.

Q. And going to -- Looking at Exhibit 92, if you would. Can you do that? Is that in front of you, ma'am?

A. Yes.

MS. POSWISTILO: If we could get 92 on the screen.

BY MS. POSWISTILO:

Q. First, looking at the top portion of Exhibit 92, it's called a check request, correct?

A. Yes.

Q. Now, could you -- are you familiar with a check request?

A. Yes.

Q. Do you know what this form is?

A. Yes.

Q. Could you describe to the jurors exactly what this is, based on your working at Serono?

A. This is a standard check request form to our finance department. In this particular case, it is requesting a check payable to Dr. Corazon in the amount of $4,000 for a grant.

Q. And do you see the bottom portion of that check request?

A. Yes, I do.

Q. "Requested by," is that you?

A. Yes.

Q. And there's an "Approved by" with a signature. Do you know what that is?

A. That's John Bruens' signature. Is that what you're asking?

Q. Yes. That's John Bruens'?

A. Yes.

Q. And flipping to the next page of this exhibit, do you recognize this, or have you seen this part of this exhibit before?

A. Yes. This is a copy of the check.

Q. To whom?

A. To Dr. Corazon.

Q. In the amount of what?

A. $4,000.

Q. And can you read the date on the check?

A. Can I read the what?

8

Appendix A
Corazon References in Witness Testimony

> Q. The date on the check.
>
> A. April 15, 1999.
>
> Q. And is this a check that you requested relating to a grant?
>
> A. Yes.
>
> Q. And is this a grant reflecting Dr. Corazon's attendance at Cannes, France -- the program at Cannes, France?
>
> A. I would say yes.

Day 7 192:10-195:1.

**Michael English Testimony**

> Q. Now, let me ask you this: Did he make any statements regarding a Dr. Corazon?
>
> A. He mentioned Dr. Corazon during the interviews, yes.
>
> Q. And could you tell the jurors what he said about Dr. Corazon?
>
> A. Dr. Corazon was one of the doctors that he came to know by visiting clinics in the Newark area. He stated that Dr. Corazon worked at the Peter Ho Clinic in Newark, and that he also had an office in Paterson. And he also stated that Dr. Corazon was the biggest prescriber of Serostim in North Jersey.

Day 8 83:25-84:10.

> Q. My question was: Did he make any statements regarding a program operated by Serono -- I said in Cannes, France?
>
> A. Yes. Serono had a program for doctors to attend the conference that was being held in 1999 in Cannes, France.
>
> Q. And did he describe -- did he make any statements regarding what doctors would go to the conference?
>
> A. He stated that only doctors who exceeded their normal prescription rate by a certain percentage would be considered -- he wasn't sure of the specific percent, he said he thought it might be 10 percent. He recalled that Dr. Corazon went, and he wasn't sure, but he thinks that Dr. Belt also attended the conference.
>
> Q. And that was a Dr. Belt?
>
> A. Belt. Yes.
>
> Q. Now, did he make any statements as to who selected the doctors who attended?
>
> A. Yes. He said that other individuals had made the selection.
>
> Q. And did he say how -- who paid for the expenses?
>
> A. Serono paid for the hotel, the airfare and meals, and he also stated that they provided the doctors with spending money.

Appendix A
Corazon References in Witness Testimony

> Q. Now, sir, you mentioned a Dr. Corazon. Are you familiar with Dr. Corazon?
>
> A. Yes.
>
> Q. And do you know, sir, whether Dr. Corazon is a Medicaid prescriber in New Jersey?
>
> A. Yes, he is.
>
> Q. Do you know whether he was a Medicaid prescriber in the year 1999?
>
> A. Yes, he was.

Day 8 84:20-86:2.

> Q. And he also told you about a program to send doctors to Cannes, France, did he not?
>
> A. Yes.
>
> Q. And he told you that Dr. Corazon was selected to go to the program; is that right?
>
> A. Yes.
>
> Q. And he also told you that Dr. Corazon went to another program in Arizona or Colorado. Do you remember that?
>
> A. Yes.

Day 8 93:6-16.

Appendix A
Corazon References in Witness Testimony

10